**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-1756
_____

UNITED STATES OF AMERICA

v.

JAMES L. CHEESEMAN,
Appellant

_____

On Appeal from the District Court
for the District of Delaware
(No. 09-cr-00124-001)
District Judge: Honorable Sue L. Robinson

_____

Argued October 27, 2009

Before: SLOVITER, FUENTES, and HARDIMAN,
Circuit Judges

(Opinion Filed: March 2, 2010)

-1-

Chandra J. Williams (Argued)
Charles M. Oberly, III
Drinker Biddle & Reath, LLP
1100 North Market Street
Suite 1000
Wilmington, DE 19801

Counsel for Appellant

Keith M. Rosen (Argued)
Lesley F. Wolf
Office of the United States Attorney
1007 N. Orange Street
Suite 700
P.O. Box 2046
Wilmington, DE 19899

Counsel for Appellee

---

OPINION OF THE COURT

---

FUENTES, Circuit Judge:

Appellant, James L. Cheeseman, pled guilty to violating 18 U.S.C. § 922(g)(3), which criminalizes possession of firearms and ammunition by an unlawful user or addict of a controlled substance. He appeals from the District Court's judgment directing the forfeiture of over 600 firearms and ammunition enumerated in Count I of the indictment to which he pled guilty. Cheeseman raises two arguments on appeal. He first contends that forfeiture pursuant to 18 U.S.C. § 924(d)(1) was improper because the property was neither "involved in" nor "used in" a knowing violation of 18 U.S.C. § 922(g)(3). Alternatively, Cheeseman argues that forfeiture of his property violates the Excessive Fines Clause of the Eighth Amendment. Because we find that the firearms and ammunition specifically identified in Count I of the indictment were involved in Appellant's § 922(g)(3) violation, and because we conclude that the forfeiture of Cheeseman's property was not grossly disproportionate to the gravity of the § 922(g)(3) offense, we will affirm the District Court's Order of Forfeiture.

## I.   Background[1]

From 1994 through August 2007, Cheeseman was the owner and sole proprietor of X-Ring Supply, a sporting goods and firearms store located in Newark, Delaware.  The federal firearms license ("FFL") for X-Ring was held in Cheeseman's name.  X-Ring maintained an inventory of approximately 600 firearms.  The premises included a separate warehouse located next to the store.

Cheeseman's drug abuse began in 2003 after his wife ended their marriage.  Between 2005 and 2007, as his crack cocaine addiction worsened, Cheeseman converted X-Ring's warehouse into his home, storing inside it an air mattress, sleeping bag and bedding.  The District Court found that fellow crack cocaine abusers occasionally stayed with Cheeseman in the warehouse and that he occasionally turned off X-Ring's security system.  Although Cheeseman argues to the contrary, the District Court found that ammunition and gun boxes were

---

[1]   These facts are derived from the indictment and the District Court's opinion.  *See United States v. Cheeseman*, 593 F. Supp. 2d 682 (D. Del. 2009).  Although Cheeseman's recitation of the facts surrounding his access and use of X-Ring differs slightly from the District Court's findings of fact, he does not allege that those findings are clearly erroneous, nor does he point to any factual error.  He merely presents the facts in a light more favorable to his legal arguments.  After reviewing the record, including the portions cited by Cheeseman in support of his factual assertions, we discern no clear error in the District Court's findings of fact.

stored in the warehouse.

In 2005, Cheeseman completed a renewal application for his FFL, on which he indicated that he did not unlawfully use narcotics. Answering this question falsely subjects an applicant to 18 U.S.C. § 924(d) penalties. Because of Cheeseman's erratic behavior due to his severe drug habit, his sister Nancy Macknatt assumed power of attorney over her brother and began to manage X-Ring's daily operations. Accordingly, Cheeseman's presence in the store was "sporadic and unpredictable." *Cheeseman*, 593 F. Supp. 2d at 685. Nonetheless, employees found crack pipes on X-Ring's premises on at least three separate occasions.

### A.

The incident prompting this case occurred on August 5, 2007, when Delaware police officers observed a woman urinating in the parking lot of a pharmacy. The woman was Cheeseman's companion. After the police officers found drugs on her person, Cheeseman consented to a pat down, during which officers located a crack pipe and crack cocaine. A subsequent search of his vehicle revealed a second crack pipe and additional crack cocaine. Cheeseman told the police officers that he abused drugs and had recently returned from a rehabilitation facility.

Shortly thereafter, federal agents executed a search warrant at X-Ring and seized approximately 609 guns and ammunition; an estimated sixty-seven of the firearms were identified as comprising Cheeseman's personal collection. Some of the seized weapons were antique firearms. In the warehouse, agents recovered a crack pipe, a mirror with cocaine

residue, a burnt spoon with cutting residue, an ashtray with white residue, ammunition, a butane torch and a scale with white residue. Consequently, a federal grand jury returned a three-count indictment against Cheeseman with notice of forfeiture, accusing him of: (1) possession of a firearm by an unlawful drug user in violation of 18 U.S.C. § 922(g)(3); (2) possession of more than five grams of crack cocaine in violation of 21 U.S.C. § 844(a); and (3) distribution of crack cocaine in violation of 21 U.S.C. § 841(a)(1).

Relevant to this appeal, § 922(g)(3) makes it unlawful for any person "who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act . . .) . . . to . . . possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(3). Count One of the indictment identified individually the 609 firearms and a quantity of ammunition that Cheeseman was accused of illegally possessing. In December 2007, Cheeseman divested himself of all of his interest in X-Ring, selling it to Macknatt and to his other sister, Pamela Rhoades.[2]

---

[2] Now a convicted felon, Cheeseman cannot lawfully possess a firearm. *See* 18 U.S.C. § 922(g)(1). If we were to rule that the forfeiture was improper or unconstitutional, it is less than certain that the firearms and ammunition would be returned to Cheeseman's sisters, the owners of X-Ring. *Cf. United States v. Felici*, 208 F.3d 667, 670 (8th Cir. 2000) (ruling that convicted felons cannot constructively possess firearms).

**B.**

In February 2008, Cheeseman pled guilty to violating § 922(g)(3). In his plea agreement he admitted that:

> [I]f there were a trial, the Government would have to prove three elements of the offense: (1) that from on or about August 5, 2007, through August 14, 2007, the defendant possessed a firearm or ammunition; (2) that the defendant was a regular user of, or addicted to, a controlled substance during a period of time proximate to or contemporaneous with the possession of the firearm or ammunition; and (3) the above-described firearm affected interstate commerce. The defendant knowingly, voluntarily, and intelligently admits for purposes of his guilty plea and sentencing that, from on or about August 5, 2007, through August 14, 2007: (a) he actually and constructively possessed the firearms and ammunition set forth in [Count One] of the indictment; (b) he was a regular unlawful user of, and addicted to, cocaine base; and (c) the firearms and ammunition at issue affected interstate commerce.

*Cheeseman*, 593 F. Supp. 2d at 683 (internal quotation marks & citation omitted). The District Court delayed sentencing in order to hold a forfeiture hearing to determine whether the firearms and ammunition specifically enumerated in Count One of the indictment were forfeitable pursuant to § 924(d)(1), and if so, whether forfeiture would violate the Excessive Fines

-7-

Clause of the Eighth Amendment.

Section 924 is the penalty provision of the Gun Control Act of 1968 ("Gun Control Act"). Section 924(d)(1) provides that "any firearm or ammunition involved in or used in any knowing violation of subsection . . . (g) . . . of section 922 . . . shall be subject to seizure and forfeiture." Section 924(d)(2)(c) mandates that "[o]nly those firearms or quantities of ammunition particularly named and individually identified as involved in or used in any violation of the provisions of this chapter . . . shall be subject to seizure, forfeiture, and disposition." Pursuant to 26 U.S.C. § 5872(b), any firearms or ammunition forfeited may be destroyed, sold to a state, or used by the federal government.

## C.

Although the District Court did not clearly identify which portion of § 924(d) it found satisfied, i.e., whether Cheeseman "involved" or "used" the firearms in a knowing violation of § 922(g)(3), the District Court, after holding a hearing on the forfeitability of Cheeseman's property, concluded that Cheeseman's guilty plea sufficiently satisfied the statute's forfeiture requirements. The District Court first noted that the Government must prove forfeitability by a preponderance of the evidence and establish a sufficient nexus between the § 922(g)(3) violation and the property sought to be forfeited. *See* Fed. R. Crim. P. 32.2(b)(1)(A) (providing that when "the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense"). Next, the District Court rejected Cheeseman's contention that

-8-

"there [was] no evidence that he ever used or involved a firearm in any manner to facilitate his cocaine addiction." *Cheeseman*, 593 F. Supp. 2d at 687.

Rather, the District Court made the following findings of fact linking Cheeseman's drug abuse to his § 922(3)(g)(3) violation:

> [I]t is clear from the evidence and testimony presented at the evidentiary hearing as well as the uncontested [Pre-Sentencing Report] that: (1) defendant has been using cocaine since 2003; (2) he was living and using crack cocaine at X-Ring; (3) during after[-]business hours, defendant allowed users of crack cocaine to stay with him at X-Ring; (4) drug paraphernalia was found at X-Ring; (5) defendant lied about his addiction on his FFL renewal; (6) after defendant's FFL was renewed-on false pretenses-he continued to operate X-Ring, including purchasing and selling firearms; (7) he compromised the security of X-Ring by turning off the security alarm in order to allow himself and crack addicts into the retail store; (8) he stored his personal gun collection unsecured; and (9) although not actively involved in the day-to-day business of X-Ring, defendant used drugs on the premises and had unfettered access to the inventory of firearms and

ammunition.[3]

*Id.* Thus, the District Court ruled that the firearms and ammunition specifically identified in Count One of the indictment were forfeitable pursuant to § 924(d)(1).

Next, the District Court rejected Cheeseman's contention that forfeiture of the firearms and ammunition would violate the Eighth Amendment's prohibition on excessive fines. While Cheeseman contended that the seized firearms were worth approximately $500,000 and the Government countered that they were valued at $371,500, the District Court assumed, arguendo, that the actual value was the higher figure. Reasoning that the Government could have charged each individual possession as a separate offense, thereby exposing Cheeseman to multiple special assessments and statutory fines, the District Court concluded that the Government's restraint in charging rendered the forfeiture constitutional. Cheeseman was then sentenced to eight months time-served and three years of supervised release. The District Court declined to impose a fine.

## II. Discussion

Cheeseman raises two arguments on appeal. First, he contends that forfeiture of his firearms and ammunition pursuant to §924(d)(1) was improper because the property was neither involved in nor used in a knowing violation of § 922(g). Cheeseman alternatively avers that the forfeiture violates the

---

[3] Cheeseman offers "innocent" explanations for his behavior. For example, he contends that he would occasionally turn off X-Ring's security cameras for privacy reasons when he had female companionship at the store. (*See* Appellant's Br. 17.) He does not, however, explain why the District Court's finding constitutes clear error.

Eighth Amendment's prohibition on excessive fines.[4]  We do not find either argument persuasive.

### A. Statutory Arguments

Cheeseman first argues that forfeiture pursuant to 18 U.S.C. § 924(d) was improper because the contraband was not "involved in" or "used in" a knowing violation of the substantive provision of the Gun Control Act to which he pled guilty.  We will first address the second of the two alternatives in the statute, which permits forfeiture of firearms and ammunition "used in" a § 922(g)(3) violation.

---

[4] The District Court had subject matter jurisdiction over this criminal case pursuant to 28 U.S.C. § 1331.  We exercise jurisdiction over this appeal from the final judgment of conviction pursuant to 28 U.S.C. § 1291.  Even though Cheeseman no longer owns the firearms or ammunition, Federal Rule of Criminal Procedure 32.2(4)(A), which governs criminal forfeiture, provides that a forfeiture becomes final at sentencing and that a defendant may appeal a forfeiture order once sentenced.  *See United States v. Bennett*, 423 F.3d 271, 275 (3d Cir. 2005) (holding that a final order of forfeiture can only be imposed as part of a defendant's criminal sentence); *United States v. Pelullo*, 178 F.3d 196, 202 (3d Cir. 1999) (noting that "the order of forfeiture entered at sentencing is a final order with respect to the defendant from which he can appeal").

We review a district court's factual findings for clear error and exercise plenary review over a district court's interpretation of a statute.  *See United States v. Rivera Constr. Co.*, 863 F.2d 293, 295 n.3 (3d Cir. 1988).  We review de novo a district court's determination of whether a forfeiture constitutes an excessive fine in violation of the Constitution's Eighth Amendment. *See United States v. Bajakajian,* 524 U.S. 321, 336-37 (1998).

-11-

The first step in interpreting the meaning of § 924(d)(1) is analyzing the statutory text. *See Bailey v. United States*, 516 U.S. 137, 144-45 (1995). Because neither "involved in" nor "used in" is defined in the statute, we look to the ordinary and natural meaning of the words, as well as the "placement and purpose [of the phrases] in the statutory scheme." *Id*. at 145 (internal quotation marks & citation omitted). Thus, the "meaning of statutory language, plain or not, depends on context." *Id*. at 144-45 (instructing interpreting courts to review the "language, context, and history" of a statute). In turn, it is appropriate to examine similar language in the statute to ascertain the meaning of undefined terms. *See id.* (noting that "using a firearm should not have a different meaning in § 924(c)(1) than it does in § 924(d)") (internal quotation marks & citation omitted).

If a statute is ambiguous and punitive in nature, "the rule of lenity requires that any ambiguity in the statute be resolved in favor of the claimant." *United States v. $734,578.82 in United States Currency*, 286 F.3d 641, 657 (3d Cir. 2002) (citing *United States v. One 1973 Rolls Royce,* 43 F.3d 794, 801 (3d Cir. 1994)). The rule of lenity, however, is inapplicable if there is only a mere suggestion of ambiguity because most "statutes are ambiguous to some degree." *See id*. at 658 (internal quotation marks & citation omitted). Furthermore, any "[j]udicial perception" that the result in a case is unreasonable may not enter into our interpretation of an unambiguous statute. *See Comm'r v. Asphalt Prods. Co.,* 482 U.S. 117, 121 (1987).

### 1. "Used In" Prong of 18 U.S.C. § 922(g)(3)

Cheeseman argues that forfeiture pursuant to 18 U.S.C. § 924(d)(1) was improper because the seized firearms and ammunition were not "used in" his § 922(g)(3) violation. Although no precedential case law directly addresses the meaning of "used in" with respect to a § 922(g)(3) violation, in a trilogy of cases the Supreme Court has extensively explored

the meaning of "uses" in the § 924(c) context. Section 924(c) adds five years to a sentence for anyone who uses, carries, or possesses a firearm during and in relation to a crime of violence or a drug trafficking crime. Because the meaning of "use" is presumed to be the same in §§ 924(c) and 924(d)(1), these cases guide our interpretation of the meaning of the phrase "used in any knowing violation of subsection . . . (g) . . . of section 922" in § 924(d)(1). *See Powerex Corp. v. Reliant Energy Servs., Inc.,* 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

The first case in which the Supreme Court addressed the definition of "uses" in the context of § 924(c) was *Smith v. United States*, 508 U.S. 223 (1993). In *Smith*, the Court ruled that trading a firearm for drugs constituted a "use" for purposes of applying § 924(c)'s enhanced penalty. 508 U.S. at 225. The Court looked at the dictionary definition of "use," noting that it is defined, variably, as "[t]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of." *Id*. at 229 (internal quotation marks & citation omitted). Thus, according to the plain language of the term, the *Smith* Court ruled that "use" of a firearm is not limited to firing a firearm. *Id*. To the contrary, the Court held that Smith used the firearm when he traded it for drugs. *See id*. at 240-41.

Two years later in *Bailey v. United States*, 516 U.S. 137 (1995), the Court addressed whether mere possession of a firearm constituted a "use" of a firearm during and in relation to

drug trafficking.[5]    Ruling in the negative, the Court concluded that "evidence of the proximity and accessibility of a firearm to drugs or drug proceeds is  alone [in]sufficient to support a conviction for 'use' of a firearm during and in relation to a drug trafficking offense." *Bailey*, 516 U.S. at 138-39.  Invoking the canon of statutory interpretation that "a legislature is presumed to have used no superfluous words," the Court reasoned that the expansive reading of "use" urged by the government would also encompass carrying a firearm, thereby rendering the term "carry" superfluous. *Id*. at 145-46.  Because the Court discerned no intention by Congress for these terms to be redundant, it rejected the government's expansive reading of "use."  Thus, according to *Bailey*, "use" requires more than mere possession of a firearm; rather, "use" entails active employment or utilization of a firearm to bring it within the meaning of § 924(c).  *See id.* at 143.

Finally, in *United States v. Watson*, the Court ruled that trading drugs for a firearm did not constitute a use within the meaning of § 924(c).  552 U.S. 74, 76 (2007).  Building upon *Smith* and *Bailey*, the *Watson* Court noted that in a bartering situation, a "seller does not 'use' a buyer's consideration." 552 U.S. at 79 (citation omitted).  Thus, receipt of a gun in trade for drugs does not constitute a "use" of a firearm for § 924(c) purposes.

Citing this trilogy of cases, Cheeseman contends that forfeiture was inappropriate because the seized firearms and ammunition were not "used in" a knowing violation of §

---

[5]    At the time *Bailey* was decided, § 924(c) did not include the term "possess."  It only included the terms "carry" and "use."  After the Court ruled that mere possession did not constitute a "use" for § 924(c) purposes, Congress amended the statute to criminalize possession of a firearm during and in relation to a drug trafficking offense.

-14-

922(g)(3). The Government counters that Cheeseman employed the firearms by "purchasing them, offering them for sale [through X-Ring], and using the proceeds to support his crack cocaine addiction." (Appellee's Br. 23.) According to the Government, like the defendant in *Smith*, Cheeseman bartered with his firearms to purchase drugs. To adopt this argument, we must accept that (1) illegally purchasing guns on behalf of X-Ring (2) in order to sell those guns to lawful buyers (3) for the purpose of using the proceeds from the sales to purchase drugs, is similar to the facts of *Smith*, in which the defendant gave his gun directly to a drug dealer for cocaine. This reasoning stretches *Smith* too far and therefore must be rejected. There is no evidence in the record suggesting that Cheeseman actively employed the firearms or traded his firearms to drug dealers to purchase crack cocaine. Rather, the record supports a finding that Cheeseman unlawfully possessed the firearms while addicted to narcotics. Indeed, unlawful possession due to his status as a drug abuser was the basis for Cheeseman's guilty plea. Because *Bailey* dictates that mere possession does not constitute "use" for § 924(d)(1) purposes, forfeiture cannot be based upon this portion of the statute.

## 2. "Involved In" Prong of 18 U.S.C. § 922(g)(3)

Cheeseman's next argument, that the District Court's order should be reversed because the seized firearms and ammunition were not "involved in" a violation of the Gun Control Act, is less persuasive. Like "used in," "involved in" is not defined in § 924(d)(1). Therefore, our analysis again begins with the plain meaning of "involved." Merriam-Webster defines "involved" as: (1) "to engage as a participant"; (2) "to relate closely"; (3) "to have within or as part of itself"; and (4) "to require as a necessary accompaniment." Merriam-Webster's Collegiate Dictionary 660 (11th ed. 2003). The term's plain meaning leads to the conclusion that the seized firearms specifically identified and enumerated in Count I were

"involved in" the offense to which Cheeseman pled guilty because the firearms served as the foundation of his criminality and conviction. Indeed, without the firearms, there would have been no crime. Accordingly, the firearms were related closely to and were a necessary accompaniment to the crime charged in Count One.

Nonetheless, Cheeseman contends that the firearms were not "related at all to," nor "involved in," his addiction. (*See* Appellant's Br. 25.) This argument exposes Cheeseman's misunderstanding of § 924(d)(1). The forfeiture statute does not require that the firearms be "involved in" Cheeseman's addiction in order to be subject to forfeiture. To the contrary, § 924(d)(1) permits forfeiture of all firearms that are involved in the § 922(g)(3) offense. In other words, the object of "involved in" is not Cheeseman's addiction. Rather, "involved in" addresses the offenses enumerated in § 924(d)(1), including the § 922(g)(3) violation to which Cheeseman pled guilty.

Furthermore, as the Government notes, possession of firearms is a necessary element of a § 922(g)(3) offense. *See United States v. 13 Firearms & Ammunition Seized from 7438 KY 718 Dewitt, Ky.*, *No. 06-cv-51*, 2006 WL 1913360, at *2 (E.D. Ky. July 11, 2006) (noting that "involved in . . . includes firearms possessed by prohibited persons"); *see also United States v. Jones*, 232 F. Supp. 2d 618, 623 n.8 (E.D. Va. 2002) (reasoning that in § 922(g)(3) the firearm is the *corpus delicti*)[6]; *cf. United States v. Huber*, 404 F.3d 1047, 1056 (8th Cir. 2005) (noting that the laundered money is the corpus of a money laundering violation and is therefore "involved in" the offense).

---

[6] *Corpus delicti* means "the substance of the crime." Black's Law Dictionary 369 (8th ed. 2004).

Indeed, all § 922(g)(3) requires for a violation is mere possession of firearms by an unlawful drug abuser, and Cheeseman admitted unlawful possession in his guilty plea. Cheeseman's argument that the very firearms that serve as the basis for his underlying conviction are not "involved in" or "related to" that conviction strains credulity.

Nor is the phrase "involved in" ambiguous, which would otherwise merit application of the rule of lenity, because when read in the context of the entire statute, interpreting "involved in" to include possession of firearms does not render § 924(d)(1)'s "used in" clause redundant. *See Bailey*, 516 U.S. at 146 ("We assume that Congress used two terms ['carry' and 'use'] because it intended each term to have a particular, nonsuperfluous meaning."). When read in the context of the entire statute and in conjunction with the Gun Control Act's legislative history, it is clear that both terms "used in" and "involved in" have particular meanings.

A central goal of the Gun Control Act was restricting public access to firearms. It was enacted to "strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577, at 6 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4411. Congressional action was prompted by the "increasing rate of crime and lawlessness and the growing use of firearms in violent crime." *Id*. at 7. Additionally, the Gun Control Act amended Title IV of the Omnibus Crime Control and Safe Street Acts of 1968 to include unlawful users of narcotics in the class of individuals whose access to, and possession of, firearms Congress deemed contrary to public interest. *Id*.; *see also Huddleston v. United States*, 415 U.S. 814, 824 (1974). This purpose is illustrated by Congressman Celler's floor statement, entered into the Congressional Record during the Act's debate, wherein he noted that:

> [W]e are convinced that a strengthened [firearms control system] can significantly contribute to reduc[ing] the danger of crime in the United States. No one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses from buying, owning, or possessing firearms. This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons.

*Huddleston*, 415 U.S. at 828 (internal quotation marks & citation omitted). Therefore, § 922(g) was enacted to keep firearms "out of the hands of those not legally entitled to possess them" due to their status of falling into one of § 922(g)'s prohibited categories. *Id*. at 824 (internal quotation marks & citation omitted).[7] In other words, § 922(g) "simply strikes at the possession of firearms by the wrong kind of people." *Scarborough v. United States*, 431 U.S. 563, 573 (1977) (internal quotation marks & citation omitted). The regulation interpreting this section of the Gun Control Act defines an unlawful user of a controlled substance as someone who "uses a controlled substance and has lost the power of self-control."

---

[7] Significantly, under the Senate version of the bill, an amendment removed the prohibition on drug abusers from owning, possessing or receiving firearms or ammunition. H.R. Rep. No. 90-1577, at 30, *reprinted in* 1968 U.S.C.C.A.N. 4410, 4430. The House version of the bill, however, preserved the broad exclusion and was ultimately adopted by the Conference Committee, passed by both Chambers of Congress and signed into law. *Id*. Thus, despite a challenge from the Senate, the proscription against unlawful drug users possessing firearms remained intact.

27 C.F.R. § 478.11. Cheeseman's guilty plea makes plain that he is just such a person.

In 1986, Congress passed the Firearms Owners Protection Act ("FOPA"), which amended the Gun Control Act. FOPA was designed to relieve the "burdens" the 1968 Act imposed on lawful firearms users while simultaneously strengthening "the ability of law enforcement to fight violent crime and narcotics trafficking." H.R. Rep. No. 99-495, at 1 (1986), *printed in* 1986 U.S.C.C.A.N. 1327, 1327. FOPA also limited the forfeiture provision of the Gun Control Act to firearms or ammunition "particularly named and individually identified as involved in or used in specified violations of law." *Id*. at 13 (internal quotation marks & citation omitted). FOPA did not define the term "involved in" in either the definitions portion of the bill or in the accompanying report language. Nor did FOPA remove the prohibition on drug abusers owning, possessing or receiving firearms or ammunition.

This legislative history supports our conclusion that our interpretation of "involved in" does not render the "used in" clause superfluous. In *Smith*, the Supreme Court opined that Congress varied the statutory language in § 924(d)(1) and included the broad term "involved in" to apply to crimes in which the firearm's involvement in the enumerated offense would not require a use of the firearm. 508 U.S. at 235 (Congress "carefully varied the statutory language [in § 924(d)(1)] in accordance with the guns' relation to the offense."). Consequently, the term "involved in" necessarily has a more expansive meaning than the term "use" in order to effectuate Congress' intention that forfeiture apply to the unique crimes enumerated in § 922, which may be committed without ever using a firearm. *Id*. In this way, Congress ensured that the class of individuals it deemed should not possess weapons would have their firearms forfeited upon a violation of § 922.

As an example, the *Smith* Court noted that § 922(a)(6) criminalizes "making of a false statement material to the lawfulness of a gun's transfer." *Id*. "Because making a material misstatement in order to acquire . . . a gun is not 'use' of the gun even under the broadest definition of the word 'use,'" the Supreme Court concluded that "Congress carefully expanded the statutory language" by including the term "involved in" in the statute. *Id*. Therefore, Congress chose such a broad term to ensure forfeiture of firearms for offenses where, as in Cheeseman's case, "use" is not a necessary - or sometimes even a possible - element of the crime. Thus, when read in context of the entire statute and with Congress' intent in mind, the terms "involved in" and "used in" retain separate meanings.

In sum, we hold that possession of firearms and ammunition is sufficient for a district court to find that the property was "involved in" a § 922(g)(3) offense. This interpretation of "involved in" makes sense in light of Congress' intent to keep firearms out of the possession of drug abusers, a dangerous class of individuals, and supports a finding that the seized firearms and ammunition were "involved in" Cheeseman's § 922(g)(3) offense. This conclusion is bolstered by the District Court's findings that: (1) Cheeseman had unfettered access to the full panoply of weapons located in X-Ring; (2) he used crack cocaine in and around those weapons; and (3) he brought other drug abusers to the store and warehouse to smoke crack. Accordingly, we affirm the District Court's

determination that the specified firearms and ammunition were "involved in" Cheeseman's § 922(g)(3) violation.[8]

### 3. "Knowing" Violation of 18 U.S.C. § 922(g)(3)

Cheeseman's final statutory argument, that he did not knowingly violate § 922(g)(3), also fails. Cheeseman contends that while he pled guilty to violating § 922(g)(3), his guilty plea "does not provide an admission of 'knowingly' violating Section 922(g) for purposes of forfeiture." (Appellant's Br. 26.) Cheeseman argues, without citation to any supporting case law, that knowledge is especially important in cases, such as his, where the forfeiture is a criminal punishment. (*Id.* at 27.)

This argument is unpersuasive because it discounts firmly established case law construing the term "knowing" to require "only that the act be voluntary and intentional and not [to require] that a person knows he is breaking the law." *United States v. Sokolow*, 91 F.3d 396, 408 (3d Cir. 1996) (internal quotation marks & citation omitted). Cheeseman does not contend that his drug use or firearm possession was involuntary or unintentional.

In essence, Cheeseman invites the Court to read into § 924(d)(1) a willfulness requirement, which, if applied, would require him to have had actual knowledge that his prohibited conduct was illegal in order for the firearms to be forfeitable. (Appellant's Br. at 26-27). We reject this argument. "Congress [is] presumed to know the meanings of the words and phrases it uses in drafting statutes." *Pope by Pope v. E. Brunswick Bd. of Educ.*, 12 F.3d 1244, 1249 (3d Cir. 1993). Here, Congress used

---

[8] For the same reasons that the forfeited firearms and ammunition were "involved in" a knowing violation of § 922(g)(3), the District Court correctly found, pursuant to Federal Rule of Criminal Procedure 32.2, that a sufficient nexus existed between the forfeited property and the offense.

the term "knowing" and not "willful," clearly indicating its preference for the lower scienter. Further undermining Cheeseman's argument is the fact that Congress included a willful mens rea in another clause of 924(d)(1). Therefore, if Congress intended the first clause of § 924(d)(1) to also contain a heightened scienter, it would have used the term willful instead of knowing.

Second, despite his protestations to the contrary, in his plea agreement Cheeseman unambiguously admitted that he was an unlawful user of narcotics who knowingly possessed firearms and ammunition. Prior to enactment of FOPA, courts often considered § 922(g) strict liability crimes. *See, e.g., United States v. Capps*, 77 F.3d 350, 352 n.2 (10th Cir. 1996). After FOPA became law, however, courts read into § 922(g) a mens rea requirement. *Id*. While the statute is silent as to its requisite mens rea, the elements of a 18 U.S.C. § 922(g)(3) violation are: (1) that the defendant is an unlawful user or addicted to any controlled substance; (2) who thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate commerce. *Cf. United States v. Dodd*, 225 F.3d 340, 344 (3d Cir. 2000) (reading into the felon-in-possession portion of § 922(g)(1) a "knowing" scienter ); *Capps*, 77 F.3d at 352 (same). Therefore, because Cheeseman pled guilty to Count One, he admitted that he knowingly violated § 922(g)(3).

Third, to the extent that Cheeseman's argument is based on his contention that he had not been adjudicated an unlawful possessor of firearms at the time he committed the § 922(g)(3) offense, and was therefore not on notice that he was knowingly violating the statute, this argument also fails. This is essentially a variant on the losing argument that ignorance of the law excuses illegal conduct. *Cf. United States v. Napier*, 233 F.3d 394, 398 (6th Cir. 2000) ("[A] legally relevant status under § 922(g) may arise in the absence of any formal proceeding. For example, § 922(g)(3) prohibits an individual addicted to

-22-

controlled substances from possessing a firearm, yet an individual attains the status of a drug addict without a court proceeding of any kind.").

Accordingly, we conclude that the firearms and ammunition enumerated in Count One of the indictment are subject to forfeiture because they were "involved in" Cheeseman's knowing 18 U.S.C. § 922(g)(3) violation.

## B. Excessive Fines Claim

Having concluded that § 924(d)(1) permits forfeiture of Cheeseman's firearms and ammunition, we must determine whether that forfeiture violates the Eighth Amendment's prohibition on excessive fines.

### 1. History of the Excessive Fines Clause

The Eighth Amendment provides that: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const.  amend. VIII. There was little debate surrounding the adoption of the Eighth Amendment and no discussion regarding the inclusion within the Amendment of the Excessive Fines Clause. *See Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410, 420 n.9 (3d Cir. 2000).  Still, the Excessive Fines Clause traces its roots as far back as the Magna Carta. *See United States v. Premises Known as RR No. 1 Box 224, Dalton, Scott Twp. & North Abington Twp., Lackawanna, Pa.*, 14 F.3d 864, 875 n.12 (3d Cir. 1994) ("Blackstone says that the reasonableness of a fine must be determined by reference to Magna Carta's prohibition on excessive amercements [a common criminal sanction]. Specifically, Blackstone says 'no man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear: saving to . . . the trader his merchandize.'") (citing 4 William Blackstone, *Commentaries* *372).  Thus, at the time of the Framing, the Founders understood "'fine' . . . to mean a payment to a sovereign as

punishment for some offense." *Bajakajian*, 524 U.S. at 327 (internal quotation marks & citation omitted); *see also Austin v. United States*, 509 U.S. 602, 609 (1993) ("The purpose of the Eighth Amendment . . . was to limit the government's power to punish."). In turn, the Excessive Fines Clause restricts "the Government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Bajakajian*, 524 U.S. at 328 (internal quotation marks & citation omitted). The Eighth Amendment is applicable if the forfeiture constitutes a "fine" and is violated only if that fine is "excessive." *See Tillman*, 221 F.3d at 420.

While the Excessive Fines Clause was initially applied only to *in personam* actions, the Supreme Court expanded its applicability to civil *in rem* forfeiture proceedings if the forfeiture constituted, in part, punishment. *See Austin*, 509 U.S. at 610 (noting that sanctions can serve both a remedial and punitive purpose). This holding was narrowed somewhat by the Supreme Court in *Bajakajian*, wherein the Court noted that traditional *in rem* forfeitures were not punitive and would therefore fall outside of the Eighth Amendment's protections. 524 U.S. at 331. The Court further noted, however, that "[b]ecause some recent federal forfeiture laws have blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture, we have held that a modern statutory forfeiture is a 'fine' for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the proceeding is styled *in rem* or *in personam*." *Id*. at 331 n.6. Thus, while the Court has classified § 924(d)(1) as remedial and therefore a civil sanction, *see United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 363-65 (1984), forfeiture pursuant to this section nonetheless is subject to Eighth Amendment scrutiny. Here, the Government and Cheeseman agree that the forfeiture is criminal in nature since it is part of his criminal judgment and sentence. A defendant bears the burden of establishing that a forfeiture constitutes an

-24-

unconstitutional excessive fine. *See, e.g., United States v. Jose*, 499 F.3d 105, 108 (1st Cir. 2007).

## 2. *United States v. Bajakajian*: Gross Disproportionality

In *Bajakajian*, the Supreme Court held that the forfeiture of a sum of money grossly disproportionate to the underlying crime constituted an Excessive Fines Clause violation. *Bajakajian* involved the forfeiture of $357,144 for failure to report to the United States government sums over $10,000 transported by an individual leaving the country in violation of 31 U.S.C. § 5316(a)(1)(A). *See Bajakajian*, 524 U.S at 324-25. Bajakajian argued that forfeiture of the entire $357,144 sum involved in the reporting offense ran afoul of the Constitution. *Id*. at 324.

After first determining that the forfeiture was punitive, the *Bajakajian* Court reasoned that the next step in an Excessive Fines Clause analysis was to ascertain whether it was excessive. According to the Court, the "touchstone of the constitutional inquiry . . . is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id*. at 334. The Court further reasoned that because "judgments about the appropriate punishment for an offense belong . . . to the legislature" and because "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise[,] . . . [b]oth of these principles counsel against requiring strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense." *Id*. at 336. In turn, the Court adopted a gross disproportionality standard. *Id*.

To analyze proportionality, the *Bajakajian* Court first examined the nature of the substantive crime, noting that it was solely a reporting offense, unrelated to any other illegal activity, which required a "willful" mens rea for conviction. *Id*. at 337. Next, the Court opined that Bajakajian did "not fit into the class

-25-

of persons for whom the statute was principally designed," i.e., money launderers, drug dealers, or tax evaders. *Id*. at 338. Third, the Court noted that the six-month maximum sentence and $5,000 maximum fine recommended by the Sentencing Guidelines evidenced a "minimal level of culpability." *Id*. at 338-39. The Court also indicated that it was appropriate to compare the amount the government sought to forfeit with the maximum fine permitted under the statute. *Id*. at 339 n.14. Finally, the Court concluded that the harm Bajakajian caused was minimal since his offense only injured the government in "a relatively minor way." *Id*. at 339; *see also Premises Known as RR No. 1 Box 224*, 14 F.3d at 875 (noting that a reviewing court should evaluate the gravity of the offense, the harshness of the penalty, the sentences imposed on other criminals in the same jurisdiction, the sentences imposed for commission of the same crime in other jurisdictions and the culpability of the offender). After considering all these factors, the Supreme Court ruled the $357,144 forfeiture unconstitutional.

### 3. The Forfeiture was Not Grossly Disproportionate to Cheeseman's Crime

Applying the factors outlined in *Bajakajian*, we conclude that the forfeiture of Cheeseman's firearms and ammunition was not grossly disproportionate to his 18 U.S.C. § 922(g)(3) violation.[9] Here, unlike the reporting offense in *Bajakajian*, the illegal possession of the firearms was not the only illegality associated with Cheeseman's crime. Rather, in addition to unlawfully possessing firearms, Cheeseman was also abusing illegal narcotics.

---

[9] Though our reasoning differs from that of the District Court, because we review a district court's interpretation of the Constitution de novo, we may affirm the District Court's ruling based upon the alternative reasoning discussed in this section.

Next, Cheeseman's protestation that his crime was victimless because he did not possess the firearms as a means to procure drugs is unpersuasive because it demonstrates a misunderstanding of § 922(g)(3)'s purpose. (*See* Appellant's Br. at 32.) Cheeseman is exactly the type of individual for whom the statute was designed. Section 922(g)(3) of the Gun Control Act reflects Congress' view that certain types of individuals, including drug abusers, mental incompetents, and violent felons, should not possess firearms. This is eminently reasonable considering that intoxicated individuals should not have access to, nor possess, firearms because of public safety concerns. Therefore Cheeseman, a crack cocaine addict with unfettered access to an arsenal of weapons and ammunition, who facilitated other crack cocaine addicts' access to that arsenal, squarely fits within the class of persons whose behavior the statute aims to criminalize. Additionally, Cheeseman's contention that he legally owned and operated a firearms dealership for many years is disingenuous at best since he was abusing drugs during his ownership of X-Ring. Cheeseman's misrepresentation on his FFL application further undermines this argument.

Finally, even assuming the firearms and ammunition were worth approximately $500,000, this sum is not grossly disproportionate to the crime to which Cheeseman pled guilty. While Cheeseman correctly notes that $500,000 exceeds the fine range of $7,500 to $75,000 recommended by the Sentencing Guidelines, when weighed against the circumstances surrounding Cheeseman's crime, this factor is not dispositive. In *Bajakajian*, the amount the government sought to forfeit was $357,144, over seventy times the $5,000 maximum fine authorized by his Guideline. *See Bajakajian*, 524 U.S. at 337-38. Here, although $500,000 is roughly seventy times greater than the low end of Cheeseman's Guideline range, it is less than seven times greater than the high end of his Guideline range. In any event, when considered in light of all the factors that

*Bajakajian* instructs courts to consider, the fact that the worth of the guns is a larger sum than the Guideline fine does not sufficiently outweigh the remaining factors that militate against a finding of unconstitutionality. Furthermore, as noted in *Bajakajian*, the Guideline fine alone is not dispositive and we may also consider the statutory maximum fine that Cheeseman faced. *See id*. at 339 n.14. Here, the statutory maximum fine was $250,000. Thus, a forfeiture valued at $500,000 is only two times greater than the maximum fine permitted by the statute. *Cf. United States v. Wallace*, 389 F.3d 483, 486-87 (5th Cir. 2004) (ruling forfeiture of a $30,000 plane willfully operated without a federal registration by an individual with no criminal history would not violate the Eighth Amendment when the statutory maximum fine was $15,000). Thus, any discrepancy between the value of the firearms and the Guideline fine is not controlling and therefore does not serve as the basis for finding an Excessive Fines Clause violation.

In sum, we conclude that the forfeiture of Cheeseman's firearms and ammunition was not grossly disproportionate to his 18 U.S.C. § 922(g)(3) offense because he was abusing drugs while illegally possessing firearms, he was part of the class of persons whose behavior the statute criminalized, and the value of the firearms was at most two times the maximum penalty imposed by the statute. In turn, forfeiture of Cheeseman's firearms and ammunition did not violate the Excessive Fines Clause.

### III. Conclusion

For the foregoing reasons, we will affirm the District Court's Order of Forfeiture.

HARDIMAN, *Circuit Judge*, concurring.

I join the Majority's thoughtful and comprehensive opinion in every respect save one: because I agree with the Majority that the phrase "involved in" as used in 18 U.S.C. § 924(d)(1) is unambiguous, I do not believe recourse to legislative history is necessary or proper.

When interpreting a statute, it has long been accepted that courts should only examine legislative history when the statutory text is ambiguous or otherwise unclear. *See Ex Parte Collett*, 337 U.S. 55, 61 (1949). If the text is clear and unambiguous, our inquiry ends. *BedRoc Ltd. v. United States*, 541 U.S. 176, 183, 186 (2004); *Hay Group, Inc. v. E.B.S. Acquisition Corp.*, 360 F.3d 404, 406 (3d Cir. 2004). Moreover, we have observed that reliance on legislative history "is to be avoided whenever possible due to the inherent unreliability of using legislative history as a basis for ascertaining legislative intent." *Roe v. Casey*, 623 F.2d 829, 842 (3d Cir. 1980).

Here, after a convincing analysis of the text of § 924(d)(1), the Majority quite rightly concludes that the plain meaning of the phrase "involved in" authorizes the forfeiture of Cheeseman's firearms. Maj. Op. Typescript at 14. In rejecting Cheeseman's request that we apply the rule of lenity, the Majority states: "Nor is the phrase 'involved in' ambiguous." *Id*. at 15. Despite this conclusion, the Majority expounds upon the legislative histories of the Gun Control Act and the Firearm Owners Protection Act to buttress its textual interpretation of

1

§ 924(d)(1).  *Id.* at 16-18.  At least six of the sitting Justices of the Supreme Court have counseled against this approach.  *See, e.g.*, *Boyle v. United States*, 129 S. Ct. 2237, 2246 (2009) (Alito, J.) ("Because the statutory language is clear, there is no need to reach petitioner's remaining arguments based on . . . legislative history . . . ."); *Zedner v. United States*, 547 U.S. 489, 509-10 (2006) (Scalia, J., concurring in part and concurring in the judgment) ("Here, the Court looks to legislative history even though the remainder of its opinion amply establishes that the [statute] is unambiguous . . . Use of legislative history in this context . . . conflicts . . . with this Court's repeated statements that when the language of the statute is plain, legislative history is irrelevant."); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (Kennedy, J.) ("As the conclusion we reach today is directed by the text of [the statute], we need not assess . . . legislative history . . . ."); *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) (Ginsburg, J.) ("[W]e do not resort to legislative history to cloud a statutory text that is clear."); *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (Thomas, J.) ("When the words of a statute are unambiguous, . . . [the] judicial inquiry is complete.") (internal quotation marks omitted); *see also William L. Rudkin Testamentary Trust v. Comm'r,* 467 F.3d 149, 152 (2d Cir. 2006) (Sotomayor, J.) (quoting *Toibb v. Radloff,* 501 U.S. 157, 162 (1991)) ("'[A]lthough a court appropriately may refer to a statute's legislative history to resolve statutory ambiguity, there is no need to do so' if the statutory language is clear.").

For the foregoing reasons, I do not join that portion of the Court's opinion that delves into legislative history.

2