**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 19-3679 & 19-3774
_____

UNITED STATES OF AMERICA

v.

STAMATIOS KOUSISIS,
a/k/a Tom Kousisis,
Appellant in No. 19-3679


UNITED STATES OF AMERICA

v.

ALPHA PAINTING & CONSTRUCTION CO., INC.,
Appellant in No. 19-3774

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court Nos. 2:18-cr-00130-001 &
2:18-cr-00130-003)
District Judge: Honorable Wendy Beetlestone
_____

Argued August 18, 2021
_____

(Filed: April 21, 2023)

Before: McKEE,* GREENAWAY, Jr., and RESTREPO,

_____

* Judge McKee assumed senior status on October 21, 2022.

*Circuit Judges*


Paul G. Shapiro  **[ARGUED]**
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

David E. Troyer
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        *Attorneys for Appellee*

Lisa A. Mathewson **[ARGUED]**
Suite 1320
123 South Broad Street
Philadelphia, PA 19109

        *Attorney for Appellants*

Lawrence S. Lustberg
Gibbons
One Gateway Center
Newark, NJ 07102

        *Attorney for Amicus Appellants*

_____

OPINION OF THE COURT
_____


**McKEE**, *Circuit Judge.*

On August 30, 2018, a jury convicted Stamatios Kousisis and Alpha Painting & Construction Co., Inc. ("Alpha") of, among other things, one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and three

counts of wire fraud, in violation of 18 U.S.C. § 1343. Kousisis and Alpha appeal the District Court's (1) denial of their motion for judgment of acquittal, (2) jury instructions, and (3) loss calculations at sentencing. In addition, Alpha appeals the District Court's forfeiture order. We will affirm the convictions. Given the complex nature of the fraud in this case, we commend the District Court for its attempt to determine the amount of loss for sentencing purposes, as well as the amount to be forfeited. However, we must vacate the loss calculation and the forfeiture order and remand for further proceedings consistent with this opinion.

## I. Background

### A. Disadvantaged Business Enterprises

"The United States Department of Transportation provides funds to state transportation agencies to finance transportation projects. These funds often go towards highway construction, provided through the Federal Highway Administration ('FHWA'). In Pennsylvania, the FHWA provides such funds to the Pennsylvania Department of Transportation ('PennDOT')."[1]

Federal regulations require states that receive federal transportation funds to set participation goals for disadvantaged business enterprises ("DBEs")[2] in transportation construction projects. This is intended to promote the participation of minority and disadvantaged businesses in these federally financed Department of Transportation ("DOT") contracts. A DBE is defined as a for-profit small business "[t]hat is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged" and "[w]hose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it."[3]

The DBE program has "an aspirational goal" of having ten percent of DOT's infrastructure project funds expended on

---

[1] *United States v. Nagle*, 803 F.3d 167, 171 (3d Cir. 2015).
[2] 49 C.F.R. § 26.21.
[3] 49 C.F.R. § 26.5.

DBEs.[4] When state agencies solicit bids for DOT-financed contracts, they announce DBE participation goals for those contracts; responsive bids must explain how the contractors will meet those goals.[5] If the prime contractor is not itself a DBE, this goal can be satisfied by including one or more DBEs as subcontractors.[6] "States themselves certify businesses as DBEs. A business must be certified as a DBE before it or a prime contractor can rely on its DBE status in bidding for a contract."[7]

When a DBE participates in a contract, that DBE must perform a "commercially useful function."[8] "A DBE performs a commercially useful function when it is responsible for execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved."[9] A DBE whose "role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation" does not perform a commercially useful function.[10]

## B. Factual and Procedural History

On April 3, 2018, Kousisis, Emanouel Frangos, and their respective companies, Alpha and Liberty Maintenance, Inc. ("Liberty") were indicted for (1) conspiracy to commit wire fraud, in violation of § 1349, (2) wire fraud, in violation of § 1343, and (3) false statements, in violation of 18 U.S.C. § 1001.

The indictment charged the Defendants with conspiring to defraud DOT and PennDOT by exploiting DOT's DBE program. The charges arose out of two DOT-financed contracts for work in Philadelphia: the Girard Point Project and the 30th Street Project (together, the "Philadelphia Projects" or the

---

[4] 49 C.F.R. § 26.41.
[5] *See Nagle*, 803 F.3d at 171.
[6] *Id.*
[7] *Id.* (citations omitted).
[8] 49 C.F.R. § 26.55(c).
[9] 49 C.F.R. § 26.55(c)(1).
[10] 49 C.F.R. § 26.55(c)(2).

"Projects"). The Girard Point Project involved a $70.3 million contract to perform painting and repairs on the Girard Point Bridge over the Schuylkill River. It was awarded to Alpha, Liberty, and another entity, Buckley, Inc., in 2009. The 30th Street Project involved a $50.8 million contract to perform repairs at the Amtrak 30th Street Train Station in Philadelphia. That contract was awarded to Buckley and another entity, Cornell and Company ("Cornell") in 2010, and it included a $15 million painting subcontract awarded to Alpha and Liberty in 2011.

Both contracts for the Philadelphia Projects included DBE requirements. The Girard Point Project required the successful bidder to commit to contracting with a DBE for at least six percent of the contract amount. The 30th Street Project had a DBE requirement equal to seven percent of the contract amount. The Defendants submitted bids in which they committed to working with Markias, Inc. on the Philadelphia Projects. Markias, Inc. was a company that had prequalified as a DBE in Pennsylvania. The Defendants' bids stated that they would obtain $4.7 million in paint supplies from Markias for the Girard Point Project and $1.7 million for the 30th Street Project. The terms of the Philadelphia Projects' contracts provided that failure to comply with DBE regulations would be a material breach.

During the performance of these contracts, the Defendants periodically submitted false documentation regarding Markias' role in the Philadelphia Projects. That documentation was a condition precedent to obtaining credit towards the DBE goals and, therefore, to complying with the contracts' terms. Each of those submissions falsely certified that Markias acted as a "regular dealer" in supplying products. In reliance on these misrepresentations, PennDOT awarded the Defendants DBE credits and paid the Defendants based on their asserted compliance with the Projects' DBE requirements. As established at trial, failure to certify compliance with the DBE requirements could have led to debarment, financial penalties, or withholding of progress payments.

Rather than supplying products or performing some other commercially useful function as required by the explicit

terms of the contracts, Markias served merely as a pass-through for Alpha-Liberty. Markias did not do any work on the Projects or supply any of the materials for them, despite the Defendants' certifications to the contrary.

To hide the fact that Markias was doing no work on the Philadelphia Projects, the Defendants arranged for the true paint suppliers to send their invoices to Markias. Markias then issued its own invoices, added a 2.25% fee, and forwarded the pass-through invoices to Alpha-Liberty. Alpha-Liberty then forwarded those fraudulent invoices to PennDOT. This arrangement was detailed in a letter from Kousisis to Markias. The letter specified that Alpha-Liberty would identify the actual suppliers for the products that it needed. Alpha-Liberty would then negotiate prices and terms with those suppliers and create fraudulent purchase orders in Markias' name. In turn, the Defendants issued two sets of checks to Markias. One check paid Markias its 2.25% fee for acting as a pass-through. Markias forwarded the other check to the actual suppliers to pay for the materials that the Defendants ordered directly from them. The Defendants also routed invoices related to supplies used on projects outside Pennsylvania through Markias. This made it appear that the materials were used on the Philadelphia Projects.

The jury returned a mixed verdict based on this evidence. It acquitted Kousisis and Alpha on two of the wire fraud counts, but convicted them of false statements, in violation of § 1001, conspiracy to commit wire fraud, in violation of § 1349, and wire fraud, in violation of § 1343. Furthermore, the District Court issued a $10,906,553 forfeiture order against Alpha. This appeal followed.

## II. Discussion

Kousisis and Alpha (together, "Appellants") raise three main issues on appeal. First, they claim that the government failed to prove the "property" element of wire fraud. They also challenge the District Court's jury instructions and loss calculations at sentencing. In addition, Alpha contests the District Court's forfeiture order. We address each argument in turn.

6

## A. The Property Element of Wire Fraud

The federal wire fraud statute, 18 U.S.C § 1343, criminalizes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," that uses wires. It is now well established that the federal wire fraud provision *only* extends to property rights.[11] Moreover, for the government to establish wire fraud, the property involved "must play more than some bit part in a scheme: It must be an 'object of the fraud.'"[12] This must be evaluated from the victim's perspective. Thus, the victim's loss must have been an *objective* of the fraudulent scheme; it is insufficient if that loss is merely an incidental byproduct of the scheme.[13]

Appellants claim that the District Court erred in denying judgment of acquittal because the government failed to prove beyond a reasonable doubt that they defrauded PennDOT out of property, as required by the wire fraud statute. We exercise plenary review over a District Court's denial of a motion for judgment of acquittal and use "the same standard the district court uses in deciding the motion."[14] We review the record "in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."[15]

Appellants argue that the fraudulent misrepresentation that Markias was the required DBE does not implicate the property interest needed to establish a § 1343 violation. They rely on the fact that they fully discharged their painting and repair obligations in the Philadelphia Projects. More

---

[11] *Carpenter v. United States*, 484 U.S. 19, 25 (1987).

[12] *Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)).

[13] *Id*. at 1573 n.2.

[14] *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424 (3d Cir. 2013) (en banc).

[15] *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)).

specifically, they contend that their "offense conduct[] involve[d] high quality, timely and fully performed work by [Appellants] that saved PennDOT millions of dollars."[16] Though they concede that Markias did not perform as promised, they characterize the presence of a true DBE as an "intangible interest" that cannot equate with the property or pecuniary loss required by the statutes of conviction.[17] They therefore maintain that the government was not deprived of any *property*.

At first, this argument has superficial appeal; however, it does not survive closer scrutiny. It requires that we ignore the text of the statutes that Appellants were convicted of violating, as well as Supreme Court decisions interpreting those statutes. The contextual background of the wire fraud statute illustrates the weaknesses in Appellants' arguments.

### i.        Evolution of Federal Wire Fraud

"Some decades ago, courts of appeals often construed the federal fraud laws to 'proscribe[ ] schemes to defraud citizens of their intangible rights to honest and impartial government.'"[18] The Supreme Court limited those decisions in *McNally v. United States*[19] by holding that the federal mail fraud statute is limited to the protection of money or property rights.[20]

---

[16] Alpha Opening Br. at 55.

[17] Kousisis Opening Br. at 19.

[18] *Kelly*, 140 S. Ct. at 1571 (quoting *McNally v. United States*, 483 U.S. 350, 355 (1987)).

[19] 483 U.S. 350 (1987).

[20] The federal wire fraud statute, 18 U.S.C. § 1343, is nearly identical to the federal mail fraud statute, 18 U.S.C. § 1341. As we have explained, "the cases construing the mail fraud statute are applicable to the wire fraud statute as well." *United States v. Tarnopol*, 561 F.2d 466, 475 (3d Cir. 1977), *abrogated on other grounds by Griffin v. United States*, 502 U.S. 46 (1991); *United States v. Yusuf*, 536 F.3d 178, 188 n.14 (3d Cir. 2008) (same). Thus, as the "statutes differ only in form, not in substance," mail and wire fraud are treated the same in our analysis. *United States v. Morelli*, 169 F.3d 798, 806 n.9 (3d Cir. 1999); *see also United States v. Frey*, 42 F.3d

8

In *McNally*, a Kentucky official and an insurance company made the following arrangement—the state would continue its agency relationship with the company in exchange for the company sharing some of its commissions with other insurance agencies specified by the official, including an entity that he controlled.[21] In the ensuing prosecution, the government did not attempt to prove that the Commonwealth would have "paid a lower premium or secured better insurance" absent the fraud.[22] Rather, the prosecution's theory was that the scheme "defraud[ed] the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly."[23]

The Supreme Court rejected this theory and held that "honest services" fraud was not mail fraud under 18 U.S.C. § 1341. The Court relied on both the statute's legislative history and its prior decision in *Durland v. United States*,[24] a case it had decided a century earlier. *Durland* was the first case in which the Supreme Court interpreted the phrase "any scheme or artifice to defraud."[25] The Court there held that the mail fraud statute covered fraudulent schemes involving not only "representations as to the past or present," but also included "suggestions and promises as to the future."[26] However, a few years later, in 1909, Congress codified *Durland*'s holding by adding the phrase "'or for obtaining *money or property* by means of false or fraudulent pretenses, representations, or promises' after the original phrase 'any scheme or artifice to defraud.'"[27]

---

795, 797 (3d Cir. 1994) ("The wire fraud statute, 18 U.S.C. § 1343, is identical to the mail fraud statute except it speaks of communications transmitted by wire.").

[21] *McNally*, 483 U.S. at 352.

[22] *Id*. at 360.

[23] *Id*. at 353.

[24] *Id*. at 356–60 (citing *Durland v. United States*, 161 U.S. 306 (1896)).

[25] *Id*. at 356.

[26] *Id*. at 357.

[27] *Id*. (emphasis added) (quoting Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130).

The *McNally* Court reasoned that the 1909 amendment was enacted to make it "unmistakable that the [mail fraud] statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property."[28] It determined that reading the concept of "honest services" fraud into a federal fraud statute would result in the federal government establishing codes of conduct for public officials.[29] Accordingly, the Court rejected a statutory construction that "involves the Federal Government in setting standards of disclosure and good government for local and state officials," and instead held that § 1341 is "limited in scope to the protection of property rights."[30]

Soon after *McNally* was decided, Congress responded by enacting 18 U.S.C. § 1346, the "honest-services" fraud provision. That statute provides: "For the purposes of th[e] chapter [of the U.S. Code that prohibits, *inter alia*, mail fraud, § 1341, and wire fraud, § 1343], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."[31] As the Supreme Court later explained, *McNally* "presented a paradigmatic kickback fact pattern" and Congress undoubtedly sought to reverse the case on its facts by enacting § 1346.[32]

It seemed apparent that, in enacting § 1346, Congress intended to criminalize fraudulent schemes aimed at "depriv[ing] another of the intangible right of honest services," regardless of whether the scheme sought to divest the victim of any property.[33] Nevertheless, in *Skilling v. United States*, the Court concluded that § 1346 was so vague that it had to be limited to classic bribes or kickbacks.[34] That case involved the former C.E.O. of Enron Corporation, Jeffrey Skilling. He was convicted of, among other things, conspiracy to commit honest-services wire fraud for participating in a scheme to deceive investors about Enron's true financial performance by

---

[28] *Id*. at 359.

[29] *Id*. at 360.

[30] *Id*.

[31] *Skilling v. United States*, 561 U.S. 358, 402 (2010).

[32] *Id*. at 407–08, 410.

[33] *Id*. at 402.

[34] *Id*. at 408–10.

manipulating its publicly reported financial results and making false and misleading statements.[35] On appeal, Skilling argued that § 1346's prohibition of honest-services fraud was unconstitutionally vague.[36] The Supreme Court agreed and limited the reach of the statute to conduct amounting to bribes and kickbacks,[37] thus providing an unambiguous limitation on the fraudulent deprivation of "honest services." In doing so, the Court relied heavily on the holdings of several Courts of Appeals in cases decided before its decision in *McNally*.[38] The Court explained that it was necessary to limit § 1346's reach because "[r]eading the statute to proscribe a wider range of offensive conduct . . . would raise the due process concerns underlying the vagueness doctrine."[39] Thus, the Court again clarified that federal fraud statutes do not reach strictly intangible interests.[40]

The Court reinforced this point in *Cleveland v. United States*.[41] There, the government charged a defendant with various counts of money laundering, racketeering, and conspiracy in connection with a "scheme to bribe [Louisiana] state legislators to vote in a manner favorable to the video poker industry."[42] One of the predicate acts supporting these charges was § 1341 mail fraud, because the defendant fraudulently concealed key information in his application for a state video poker license.[43] The government argued that the defendant thereby deprived it of property because he had "frustrated the State's right to control the issuance, renewal,

---

[35] *Id.* at 369, 375.

[36] *Id.* at 399.

[37] *Id.* at 408–09.

[38] *Id.* at 408 ("Both before *McNally* and after § 1346's enactment, Courts of Appeals described schemes involving bribes or kickbacks as 'core . . . honest services fraud precedents [.]' . . . In view of this history, there is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks." (collecting cases)).

[39] *Id.*

[40] *Id.* at 404, 408–09.

[41] 531 U.S. 12 (2000).

[42] *Id.* at 16.

[43] *Id.* at 16–17.

and revocation of video poker licenses."[44] The Supreme Court disagreed. It held that the federal mail fraud statute does not encompass fraudulent schemes to obtain a state license, because a license is not property in the government's hand.[45] As the Court explained, the State's "core concern" in issuing the licenses was regulatory.[46] Licensing is a "paradigmatic exercise[] of the States' traditional police powers" concerning who should get a benefit and who should not.[47] That power did not relate to the government's interests as a property holder. Since the object of the fraud was not property in the victim's hands, the defendant's dishonest conduct was not property fraud.[48] "[S]aid another way: The defendant's fraud 'implicate[d] the Government's role as sovereign' . . . . And so his conduct, however deceitful, was not property fraud."[49]

More recently, in *Kelly*, the Court similarly vacated a federal wire fraud conviction based on the distinction between governmental property interests and its regulatory power. There, public officials ordered an unannounced realignment of toll lanes on the George Washington Bridge connecting New Jersey and Manhattan.[50] The Court described the bridge as "the busiest motor-vehicle bridge in the world."[51] The closure caused four days of gridlock in Fort Lee, New Jersey.[52] The defendants sought to justify the closure by claiming that it was part of a traffic study.[53] "In fact, they did so for a political reason—to punish the mayor of Fort Lee for refusing to support the New Jersey Governor's reelection bid."[54] The Supreme Court reversed the public officials' federal wire fraud convictions. It explained that their scheme fell outside the scope of the federal statutes prohibiting wire fraud:

---

[44] *Id*. at 23.

[45] *Id*. at 23–24.

[46] *Id*. at 20.

[47] *Id*. at 23.

[48] *Id*. at 26–27.

[49] *Kelly*, 140 S. Ct. at 1572 (quoting *Cleveland*, 531 U.S. at 23–24).

[50] *Id*. at 1568.

[51] *Id*. at 1569.

[52] *Id*. at 1568.

[53] *Id*.

[54] *Id*.

Under settled precedent, the officials could violate those laws only if an object of their dishonesty was to obtain the Port Authority's money or property. The Government contends it was, because the officials sought both to "commandeer" the Bridge's access lanes and to divert the wage labor of the Port Authority employees used in that effort. We disagree. The realignment of the toll lanes was an exercise of regulatory power—something this Court has already held fails to meet the statutes' property requirement. And the employees' labor was just the incidental cost of that regulation, rather than itself an object of the officials' scheme.[55]

In reversing the convictions, the Court emphasized that "the loss to the victim [cannot be] only an incidental byproduct of the scheme."[56] The Court reasoned that such a rule is necessary to ensure that the property fraud statutes do not make a federal crime of every deceit.[57]

### ii.  Appellants' Scheme

*Kelly* and *Cleveland* instruct that when the victim's damages are incidental to the object of the fraudulent scheme (i.e., toll worker labor costs in *Kelly* and fees associated with issuing licenses in *Cleveland*), there is an insufficient property interest to sustain a wire fraud conviction. Appellants rely on this line of cases to argue that any loss by PennDOT here cannot be classified as pecuniary because, as we have explained, PennDOT received the repairs it paid for. This argument ignores the Supreme Court's explicit declaration to the contrary. The Court has unambiguously held that there could have been no fraud in those cases unless "an object of the[] dishonesty was to obtain the [government]'s money or property."[58] Here, obtaining the government's money or

---

[55] *Id.* at 1568–69 (citation omitted).
[56] *Id.* at 1573.
[57] *Id.* at 1573 n.2 ("Without that rule, . . . even a practical joke could be a federal felony.").
[58] *Id.* at 1568.

property was *precisely* the object of Appellants' fraudulent scheme.

Put simply, Appellants set out to obtain millions of dollars that they would not have received but for their fraudulent misrepresentations. Depriving PennDOT of DBE performance was *incidental* to that scheme. A hypothetical employed by the Supreme Court in *Kelly* illustrates this point. There, the Court explained that "a city parks commissioner induc[ing] his employees into doing gardening work for political contributors" *would* meet the federal fraud statute's property requirement since "[t]he entire point of the fraudsters' plans was to obtain the employees' services" and "[a] government's right to its employees' time and labor . . . can undergird a property fraud prosecution."[59] Likewise, the "entire point" of Appellants' scheme was to obtain PennDOT's money.

In contrast, consider another example set forth by the Seventh Circuit Court of Appeals in *United States v. Walters*.[60] Suppose "A [e-mails] B an invitation to a surprise party for their mutual friend C. B drives his car to the place named in the invitation [thus expending the cost of gasoline]. But there is no party; the address is a vacant lot; B is the butt of a joke."[61] Wire fraud? No. The victim's loss in this scenario was merely incidental to the scheme which, on its own, cannot sustain a wire fraud conviction. But that is not the case here.

Although Appellants' scheme could not have been consummated without falsely certifying the DBE participation, those false certifications were merely incidental to the true purpose of the fraudulent agreement—obtaining millions of dollars from PennDOT. Appellants' attempts to have us exclusively fixate on the absence of a DBE would require us to ignore that the Court reversed the convictions in *Skilling* and *Cleveland* exactly because the object of the fraudulent schemes in those cases was something *other* than the government's money. That the misrepresentations about DBE participation were not the objective of the scheme distinguishes this case

---

[59] *Id*. at 1573.

[60] 997 F.2d 1219 (7th Cir. 1993).

[61] *Id*. at 1224.

14

from the "intangible interest" scenarios that were at the heart of the fraudulent schemes in *Skilling* and *Kelly*. PennDOT's dollars establish the requisite property interest here, not the socially laudable objective of ensuring participation by a DBE.[62]

Moreover, there was clearly a kickback here and thus economic harm sufficient to sustain wire fraud convictions. This is true even though the government does not allege economic *net* loss. The jury convicted the Defendants for paying Markias a 2.25% fee for acting as a pass-through. Unlike in *McNally*, here, the fee Markias received was the government's money.[63] The money was not an amount

---

[62] Though Appellants' misrepresentations about DBE participation were collateral to their scheme, the importance of DBE programs more generally cannot be understated. DOT's DBE program strives, in part, to prevent discrimination against DBEs in the award and administration of "DOT-assisted contracts" and to provide DBEs an equal opportunity to compete for such contracts. 49 C.F.R. § 26.1. The agency explicitly states that the initiative aims to "remedy ongoing discrimination and the continuing effects of past discrimination in federally-assisted highway, transit, airport, and highway safety financial assistance transportation contracting markets nationwide." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEPARTMENT OF TRANSPORTATION, https://perma.cc/SGW8-HMET (last visited April 4, 2023). To that end, state and local recipients of DOT funding frequently ensure DBE participation in their contracts. For instance, 879 of the 1,402 contracts awarded by PennDOT in the second half of Fiscal Year 2020 required DBE participation. *See Uniform Report of DBE Commitments/Awards and Payments*, PENNSYLVANIA DEPARTMENT OF TRANSPORTATION, https://perma.cc/YD3N-DUWZ (last visited April 4, 2023).

[63] *McNally*, 483 U.S. at 360–61 ("[The state officers] received part of the commissions but those commissions were not the Commonwealth's money. Nor was the jury charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent. Indeed, the premium for insurance would have been paid to some agency, and what [the state officers] did was to assert control that the

15

PennDOT would have paid regardless of which contractor performed the work.

In *United States v. Wheeler*,[64] the Eleventh Circuit Court of Appeals found that a defendant's "misrepresentations or fail[ure] to disclose information that a reasonable jury could find affected the nature of the bargain" may provide a basis for a wire fraud conviction.[65] There, the defendants misled investors by misrepresenting their company's "profits, its association with a famous executive and a globally recognized technology company, . . . a potential listing on a major stock exchange," and their commissions.[66] The Court held that these misrepresentations involved "essential characteristics of the stock that would alter the nature of the bargain."[67] Therefore, "the evidence provided a basis for a reasonable jury to conclude that [the defendants] schemed to defraud investors."[68] Here, PennDOT's willingness to pay a premium to involve a DBE in the Projects establishes that DBE participation was an essential component of the contract. Without it, the nature of the Parties' bargain would have been different. This is sufficient evidence to support a federal fraud conviction given all of the circumstances surrounding that misrepresentation and the millions of dollars it caused PennDOT to pay to Appellants.[69]

Amici caution that our holding today "would turn essentially every purposeful breach of contract into a potential violation of the federal criminal property fraud statutes."[70] That argument inappropriately minimizes the nature of Appellants'

---

Commonwealth might not otherwise have made over the commissions paid by the insurance company to its agent.").

[64] 16 F.4th 805 (11th Cir. 2021).

[65] *Id.* at 820.

[66] *Id.*

[67] *Id.*

[68] *Id.* at 821.

[69] To be sure, we do not suggest that without the premium PennDOT paid for the Projects, the government would have been unable to establish wire fraud. Even without the premium, Appellants' primary fraudulent objective to obtain PennDOT's funds remains.

[70] Amici Br. at 4.

scheme. Again, Appellants did not merely scheme to deprive PennDOT of the contractual requirement of DBE participation. Rather, they schemed to have PennDOT pay them millions of dollars that they were clearly not entitled to given their material breach of the contracts. Thus, to the extent that Amici raise a valid concern, the concern is with the text of the statute and the Supreme Court's interpretation of it, not its application to Appellants' actions. As noted above, Congress intended for § 1343 to criminalize "*any* scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."[71] If "any" is to be read out of the statute, as is required by Amici's argument, that must be by congressional initiative, not by this Court.

Finally, we note that, contrary to Appellants' assertions, the disputed contracts themselves do indeed constitute "property." We have previously concluded that "to determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right."[72] It is well settled that "the privilege of contracting is a property right, without which there cannot be full and free use and enjoyment of property."[73] Our holding today falls squarely within the historic understanding of traditional forms of "property." We merely acknowledge that tens of millions of dollars constitutes property.

Appellants secured PennDOT's money using false pretenses and the value PennDOT received from the partial performance of those painting and repair services is no defense to criminal prosecution for fraud.[74]

## B. Jury Instructions

---

[71] 18 U.S.C. § 1343 (emphasis added).

[72] *United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994).

[73] *Adinolfi v. Hazlett*, 88 A. 869, 870 (Pa. 1913); *see also U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) (explaining that "[c]ontract rights are a form of property").

[74] Based on the foregoing, we need not address Appellants' argument regarding the false statement convictions.

Appellants next argue that the District Court erred in its jury instructions when it "permitted conviction on multiple invalid theories of 'property fraud,' none of which required proof of economic harm."[75] Where, as here, a party has properly objected to a jury instruction, "we exercise plenary review to determine whether the instruction misstated the applicable law."[76] Appellants specifically take issue with the following instructions:

> Property for purposes of wire fraud is defined to include money, property rights, or both. Deprivation of a property right may include depriving an agency of a fundamental basis of its bargain. An agency has a property right to purchase goods and services in the open market. Furthermore, contract rights can be considered property rights for purposes of wire fraud. An agency may be deprived of its contract rights if a defendant misuses money given to it under a contract. If an agency intends to enable a DBE to provide services, a defendant promises that a DBE will provide those services, but no such services are rendered under the contract, you may find the loss of property. Deprivation of property may also include loss of money based on services paid for that an agency did not receive.[77]

Appellants contend that the instructions were faulty because they did not "require[] the 'economic harm' that characterizes a property deprivation; [or the] proof that the scheme contemplated obtaining property of which the victim was deprived."[78] The crux of their argument rests on *Kelly*'s reasoning "that interfering with a government's allocation of resources—'its prerogatives over who should get a benefit and who should not'—is not property fraud."[79] While this is true,

---

[75] Kousisis Opening Br. at 13.

[76] *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 338 (3d Cir. 2005).

[77] A3473–74.

[78] Kousisis Opening Br. at 62.

[79] *Id*. at 65 (quoting *Kelly*, 140 S. Ct. at 1572).

18

as explained above, interfering with a victim's property (i.e., obtaining a contract and thereby money) by means of false and fraudulent representations constitutes property fraud.[80]

Appellants' insinuation that the District Court's instructions equated credits towards DBE participation with property is therefore incorrect. The Court instructed the jury that "[d]eprivation of a property right may include depriving an agency of a fundamental basis of its bargain."[81] It also correctly stated the applicable law when it noted that contract rights are traditionally understood to be property rights, and there is no question that breach of a material term in a contract—a fundamental basis of a bargain[82]—by fraudulent means results in economic harm to the victim and deprives that victim of her property rights.[83] Here, PennDOT was partially deprived of the benefit of its bargain when it paid the full contract price because of a false pretense. As we have explained, PennDOT's receipt of material components of the

_____

[80] Kousisis claims that the District Court erred by not providing the jury with an instruction that the victim must have suffered a net economic loss. He argues that dispensing with this instruction "permitted conviction on the very 'unauthorized use' theory *Kelly* rejected." Kousisis Opening Br. at 65. While economic harm is required for wire fraud, economic loss is not. *See supra*, Section II(A)(ii). Also, Kousisis waived this argument at trial by only objecting to the property definition of wire fraud. In any event, the District Court's decision not to provide the jury with a loss instruction was not plain error.

[81] A3473.

[82] *See Nagle*, 803 F.3d at 182 ("They did not receive the entire benefit of their bargain, in that their interest in having a DBE perform the work was not fulfilled, but they did receive the benefit of having the building materials provided and assembled.").

[83] *See Gillard v. Martin*, 13 A.3d 482, 487 (Pa. Super. Ct. 2010) ("When one party commits a material breach of contract, the other party [may] . . . elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach . . . .") (quoting 13 Williston on Contracts § 39:32, 4th ed.).

contract does not negate the fact that the contract was based on fraudulent misrepresentations that triggered payment of millions of dollars that would not have been paid absent the fraud.

Appellants' challenge to the jury instruction is further undermined by the fact that the District Court refused the government's proposed instruction that would have allowed the jury to find "that DBE credits constitute property."[84] Indeed, the instruction the District Court ultimately gave did not turn on DBE "credits." Rather, the Court instructed: if "a defendant promises that a DBE will provide those services, but no such services are rendered under the contract, you may find the loss of property."[85] Assuming *arguendo* that we agree with Kousisis' contention that "services performed by a non-DBE have no less pecuniary value than otherwise-identical services performed by a DBE,"[86] the misrepresentation here still resulted in the loss of millions of dollars. That is most certainly "property" as required by § 1343. Moreover, even if we also agreed that the entire contract was not property loss due to the satisfactory completion of the Philadelphia Projects, PennDOT still suffered *some* property loss because some of the money paid to Appellants was used to pay the kickback to Markias.[87]

The jury was instructed that contract rights are property rights. That is clearly correct.[88] "When one party commits a material breach of contract, the other party" may "declare the default only a partial breach and recover damages caused by that partial breach."[89] The DBE provision was a material

---

[84] A3237, 3473–74.

[85] A3473–74.

[86] Kousisis Opening Br. at 66.

[87] In *McNally*, the money was going to be used to purchase insurance regardless of the public official's choices and the agency did not have control over that. *See supra*, note 63. Here, the breach of the DBE clause involved a fundamental basis of the bargain, and PennDOT did have control during the negotiations over whether it paid money for DBE services.

[88] *See Adinolfi*, 88 A. at 870 (noting that the common law of Pennsylvania recognizes contract rights as property rights).

[89] *Gillard*, 13 A.3d at 487.

component of these contracts.[90]  Accordingly, the jury instruction accurately explained that breach of that provision resulted in loss of property. And again, at the very least, the property here was the loss of the 2.25% fee "kicked back" to Markias.

### C. Loss Calculation

Pursuant to Section 2B1.1(b) of the Sentencing Guidelines, the District Court considered the extent to which Appellants' base offense level should be adjusted to account for the government's losses. It determined that their "ill-gotten profits"[91] were the appropriate measure of loss. Appellants claim that this was error. "When the calculation of the correct Guidelines range turns on an interpretation of 'what constitutes loss' under the Guidelines, we exercise plenary review."[92]

As a threshold matter, we emphasize that the District Court had a very difficult and unenviable task in arriving at a loss determination because Appellants delivered the requested work, and the quality of the workmanship and materials is uncontested. Still, we conclude that the Court's loss calculation was erroneous. The approach used by the District Court is inappropriate where, as here, the defrauded party contracted for work to be done by both DBE and non-DBE entities. That distinguishes this case from *United States v. Nagle*.[93] Before we discuss the correct method of calculating the loss, it will be helpful to provide an overview of the applicable Sentencing Guidelines provisions and our decisions in *Nagle*.

### i. Loss Calculation Under the Sentencing Guidelines

U.S.S.G. § 2B1.1 governs loss calculations for crimes involving fraud and deceit. Section 2B1.1(a) provides that the base offense level for crimes, "is either seven, if the offense has a maximum term of imprisonment of twenty years or more,

---

[90] *See supra*, Section I(B).
[91] A3721.
[92] *Nagle*, 803 F.3d at 179 (quoting *United States v. Fumo*, 655 F.3d 288, 309 (3d Cir. 2011)).
[93] *Id*. at 170.

21

or six" if it is less.[94] Section 2B1.1(b)(1) allows for several adjustments to the base offense level, based on the amount of the victim's loss. "As the loss increases, the offense level increases: for example, if the loss is more than $70,000, the court adds eight to the offense level; if the loss is more than $100 million, the court adds twenty-six to the offense level."[95]

In *United States v. Banks*,[96] we recently concluded that in calculating the loss under the Sentencing Guidelines, our focus is limited to the "actual loss" suffered by the victim.[97] "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."[98] Additionally, Note 3(F)(ii) provides an alternative framework for measuring loss under the "government benefits rule":

> In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.[99]

Controlling precedent and the Sentencing Guidelines make clear that "[e]ven where value flows in both directions,

---

[94] *Id.* at 179.
[95] *Id.*
[96] 55 F.4th 246 (3d Cir. 2022).
[97] In *Banks*, we specifically considered the commentary in Application Note 3(A) of Section 2B1.1, which provides that loss is generally determined to be the greater of the actual loss or the intended loss. We noted that the Guidelines themselves make no reference to "intended" loss; rather, it is only mentioned in the commentary. *Id.* at 257. We explained that standard dictionary definitions of "loss" only pertain to "actual loss." *Id.* at 257–58. As a result, we concluded that Note 3(A) "impermissibly expands the word 'loss' to include both intended loss and actual loss." *Id.* at 250.
[98] § 2B1.1 cmt. n.3(A)(i).
[99] § 2B1.1 cmt. n.3(F)(ii).

if it is not feasible to estimate with reasonable accuracy the victim's loss…, [then] a sentencing court may look to the perpetrator's gain as a surrogate for the victim's loss."[100] In such situations where it is not feasible to estimate the victim's loss, there must exist "some logical relationship between the victim's loss and the defendant's gain so that the latter can reasonably serve as a surrogate for the former."[101]

Moreover, Note 3(E)(i) allows for credits against the initial loss. It requires that the loss be reduced by "the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."[102]

### ii.   *United States v. Nagle*

In *Nagle*, Schuylkill Products Inc. ("SPI") and CDS Engineers, Inc. ("CDS") conspired with Marikina Engineers and Construction Corp. ("Marikina") to be awarded government contracts. Neither SPI nor CDS was a DBE.[103] However, the owner of Marikina was of Filipino descent and Marikina was a DBE-certified firm.[104] Pursuant to their arrangement, Marikina bid for subcontracts on government projects requiring DBE participation.[105] However, SPI and CDS "would perform all of the work on those contracts."[106] In turn, SPI and CDS paid Marikina a fixed fee for its assistance in getting the subcontracts for them.[107] Absent the fraudulent agreement with Marikina, SPI and CDS would not have been qualified to perform the subcontracts at issue. However, pursuant to their illicit agreement:

SPI identified subcontracts that SPI and CDS

---

[100] *United States v. Dickler*, 64 F.3d 818, 825–26 (3d Cir. 1995); U.S.S.G. § 2B1.1 cmt. n.3(B).

[101] *Id*. at 826.

[102] § 2B1.1 cmt. n.3(E)(i).

[103] *Nagle*, 803 F.3d at 172.

[104] *Id*.

[105] *Id*.

[106] *Id*.

[107] *Id*.

could fulfill, prepared the bid paperwork, and submitted the information to prime contractors in Marikina's name. SPI used stationery and email addresses bearing Marikina's name to create this correspondence. It also used Marikina's log-in information to access PennDOT's electronic contract management system. CDS employees who performed construction work on site used vehicles with magnetic placards of Marikina's logo covering SPI's and CDS's logos. SPI and CDS employees used Marikina business cards and separate cell phones to disguise whom they worked for. They also used a stamp of [the Marikina owner's] signature to endorse checks from the prime contractors for deposit into SPI's bank accounts. Although Marikina's payroll account paid CDS's employees, CDS reimbursed Marikina for the labor costs.[108]

Eventually, a jury in the Middle District of Pennsylvania found two owners of SPI and CDS guilty of, among other things, 11 counts of wire fraud in violation of § 1343.[109] At sentencing, the District Court concluded that "under Note 3(F)(ii) the amount of loss was the face value of the contracts Marikina received; and that the defendants were not entitled to a credit against the loss for the work performed."[110] The defendants appealed this loss calculation.

On appeal ("*Nagle I*"), we declined to explicitly decide whether the government benefits rule under Note 3(F)(ii) applies in DBE procurement fraud cases. Instead, we held that in such cases, regardless of whether Note 3(A) or 3(F)(ii) is used to determine the initial loss, the actual loss is calculated by subtracting the fair market value of the services rendered from the face value of the contracts (i.e., the credits against the loss).[111] In doing so, we stated that "[i]f possible and when

---

[108] *Id.*

[109] *Id.* at 173.

[110] *Id.* at 174.

[111] *Id.* at 180 ("We need not decide whether the DBE program is a 'government benefit' and, therefore, whether Note 3(A) or Note 3(F)(ii) applies; we conclude that under either

24

relevant, the District Court should keep in mind the goals of the DBE program that have been frustrated by the fraud."[112] We then remanded the matter to the District Court for resentencing consistent with that guidance.

On remand, the District Court was mindful of the crucial goals of the DBE program. It found that SPI and CDS erroneously "earned a profit and formed or strengthened valuable industry connections" in place of a true DBE.[113] Therefore, the District Court concluded that "the amount of profits diverted from legitimate DBEs" was the correct measure of the loss.[114] There, that was the entire amount of the contract because there was no DBE involvement and SPI and CDS performed all work under the contract.[115] The defendants again appealed, asserting that the final loss amount should have been zero because "'the fair market value of the services rendered is by definition the stated contract price,' and that such measure necessarily includes any profits accruing to [the defendants], as the service provider."[116]

In the second appeal ("*Nagle II*"), we affirmed the District Court's decision, albeit in a non-precedential opinion. We held that it was appropriate for the District Court to use the defendants' wrongly obtained profits as the measure of loss, particularly because "other measures for loss in this case [were] unduly complex to calculate."[117] In making this

---

application note, the amount of loss [the defendants] are responsible for is the face value of the contracts Marikina received minus the fair market value of the services they provided under the contracts.").

[112] *Id*. at 183.
[113] *United States v. Nagle*, No. 1:09-CR-384, 2015 WL 7710467, at *4 (M.D. Pa. Nov. 30, 2015), *aff'd*, *United States v. Nagle*, 664 F. App'x 212 (3d Cir. 2016).
[114] *Id*. at *5.
[115] The District Court concluded that "the amount of loss for each defendant in this case equals the amount of profits diverted from legitimate DBEs as a result of the fraudulent contracts at issue …." *Id*.
[116] *Nagle*, 664 F. App'x at 215 (citation omitted).
[117] *Id*. at 216.

determination, we partly relied on Section 2B1.1 Note 3(B).[118]

### iii.    The Instant Appeal

Here, the District Court similarly explained that the actual loss to the government from breach of the DBE provision in the Philadelphia Projects' contracts was not measurable at the time of sentencing. In accordance with Note 3(B), it also concluded that Alpha's "ill-gotten profits" represent an appropriate measure of loss. After applying the applicable taxes to Alpha's profits, the District Court imposed a 20-point sentencing enhancement under Section 2B1.1(b)(1), which corresponds to a loss between $9.5 million and $25 million.

At the outset, we again stress that the District Court had an unenviable task in calculating the loss here and we commend the Court on its effort to apply *Nagle*'s teachings to this situation without minimizing the economic and communal harm that resulted from the lack of DBE participation.

Although the *Nagle* defendants and the Defendants here both committed DBE fraud, the nature of the fraud differs in a material way. In *Nagle*, PennDOT and the Southeastern Pennsylvania Transportation Authority ("SEPTA") contracted for a DBE to perform *the entire [sub]contract* that was actually performed by SPI and CDS. PennDOT and SEPTA neither intended nor anticipated that SPI or CDS would receive any benefit or compensation pursuant to the contracts in *Nagle*. Thus, the *Nagle* defendants usurped *all* the profit intended for a DBE, as well as the business contacts and experience that could have better positioned a DBE to be a successful bidder on future contracts. Accordingly, on remand in *Nagle*, the District Court correctly concluded that the government's loss consisted of all the profits purportedly due under the contracts at issue.

However, in this case, PennDOT never intended to have the DBE perform the entire contract. Rather, it understood that

---

[118] Note 3(B) states: "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."

a DBE would provide paint supplies. The rest of the work was to be performed by Alpha.[119] Specifically, the government understood that Alpha would play a major role in rehabilitating the Girard Point Bridge and the 30th Street Train Station and that contractual undertaking was part of the bargain.

In attempting to determine the amount of loss at sentencing, the District Court rightly reasoned that "[a]s a result of Alpha's deception, the DBE program provided profit opportunities to entities not entitled to them."[120] We do not trivialize this. Nevertheless, Alpha always stood to lawfully profit from the work that it was contractually obligated to perform. All its gains were not "ill-gotten," nor did its involvement frustrate the objectives of the contract to the extent that the involvement of SPI and CDS frustrated the objectives of the contracts in *Nagle*. Thus, it cannot fairly be said that the government's loss here equals Alpha's profits.

*Nagle I* established that loss is calculated by taking the full face value of the contract and deducting the fair market value of the services rendered.[121] There, we determined that, irrespective of whether Notes 3(A) and 3(F)(ii) apply, the resulting initial loss is the same. However, we now expressly hold that the government benefits rule under Note 3(F)(ii) does *not* apply to DBE procurement fraud cases such as the one here.[122]

---

[119] We recognize that the Projects also required performance from Liberty, Buckley, and Cornell. However, we focus our discussion on Alpha (and Kousisis), as it is the entity directly involved in this appeal.

[120] A3720–21.

[121] *Nagle*, 803 F.3d at 183.

[122] There is a circuit split regarding whether the government benefits rule extends to fraud in DBE (or similar special procurement) programs. On one hand, the Fourth, Seventh, and Eleventh Circuits have found that the rule does apply here. *See United States v. Brothers Constr. Co. of Ohio*, 219 F.3d 300, 317–18 (4th Cir. 2000); *United States v. Leahy*, 464 F.3d 773, 789–90 (7th Cir. 2006); *United States v. Maxwell*, 579 F.3d 1282, 1306 (11th Cir. 2009). Notably, the Eleventh Circuit concluded that the rule applies because the "primary purpose" of such "affirmative action programs" is "to help

The government benefits rule contemplates situations where the benefit of the bargain was, essentially, unilateral. Note 3(F)(ii) uses food stamps as an example, explaining that "if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, [the] loss is $50." Procurement contracts are different. Here, the government is not just bestowing a benefit. Rather, it expects something in return for its payment. It expects, and is entitled to, a repaired bridge, highway, etc. "The mere fact that a government contract furthers some public policy objective apart from the government's procurement needs is not enough to transform the contract into a 'government benefit' akin to a grant or an entitlement program payment."[123]

With the application of Note 3(F)(ii) excluded, the remaining loss calculation analysis in *Nagle I* becomes our guide. There, we observed:

> the amount of loss [the defendants] are responsible for is the value of the contracts Marikina received less the value of performance on the contracts—the fair market value of the raw materials SPI provided and the labor CDS provided to transport and assemble those materials.[124]

Here, Alpha represented that Markias would receive up

---

small minority-owned businesses develop and grow." *Maxwell*, 579 F.3d at 1306; *accord United States v. Leahy*, 464 F.3d 773, 789–90 (7th Cir. 2006). On the other hand, the Fifth, Sixth, and Ninth Circuits reached the opposite conclusion, finding that the contracts at issue in procurement fraud cases are unlike the benefits named in Note 3(F)(ii)— "grants, loans, [and] entitlement program payments." *See United States v. Harris*, 821 F.3d 589, 604 (5th Cir. 2016); *United States v. Kozerski*, 969 F.3d 310, 313–14 (6th Cir. 2020); *United States v. Martin*, 796 F.3d 1101, 1109–10 (9th Cir. 2015). We agree with the latter group of our sister courts.

[123] *Harris*, 821 F.3d at 604.

[124] *Nagle*, 803 F.3d at 180–81.

to $1,700,000 for the 30th Street Train Station Project and $4,689,000 for the Girard Point Project, totaling roughly $6.4 million. This $6.4 million payment thus becomes the appropriate "starting point" for a loss determination here.[125] The record before us does not indicate whether the $6.4 million that Alpha agreed to pay Markias is inclusive of the 2.25% kickback fees paid to the firm. On remand, the District Court may conduct additional fact-finding to gauge whether the kickbacks should be added to the $6.4 million for the purposes of measuring the loss.

Furthermore, pursuant to *Nagle I*, the $6.4 million must be offset by the fair market value of the services rendered. Here, that is the fair market value of the non-DBE-provisioned paint supplies.[126] The actual cost of the paint supplies needed to complete the projects pursuant to these contracts is also best determined by the District Court in the first instance. We therefore vacate Kousisis' sentence and remand this matter to the District Court to recalculate the loss consistent with this opinion. Though likely imperfect, the amount reached after the offset is a "reasonable estimate of the loss."[127] This satisfies the Sentencing Guidelines' requirements.[128]

---

[125] Indeed, Alpha expressly indicated that Markias would receive $6.4 million. Therefore, this figure is the actual "price" that PennDOT "gave up" for the DBE component of the contract. *See id*. at 180 (explaining that "the defrauded parties—the transportation agencies—gave up the price of the contracts and received the performance on those contracts.").

[126] It is theoretically possible to measure the loss by the difference between Alpha-Liberty's bids and the next lowest bid on the Philadelphia Projects. Presumably, the difference between these figures may better reflect the cost of genuine DBE program compliance (and thus the government's pecuniary loss). However, that approach invites speculation because there is no way of knowing the extent (if any) that other bids may have been inflated by sham DBE participation or other factors.

[127] § 2B1.1 cmt. n.3(C).

[128] To be sure, we foresee a potential scenario where Appellants contend on remand that the fair market value of the paint supplies services rendered is equal to the face value of the DBE-designated portion of the contracts (such that the

We hasten to add, however, that the District Court need not cast a "blind eye" on the full extent of the loss occasioned by this fraud if the aforementioned metric is deemed inadequate to capture the real harm. As the District Court noted at sentencing, and as we stated in *Nagle I*: "[t]he DBE program allows true DBEs to form lasting relationships with suppliers, labor, and the broader industry; those relationships are things received and retained as a result of the program."[129] This not only benefits the individual DBE. It also benefits the contracting governmental entity by positioning DBEs to compete for future contracts, thereby enlarging and enriching the universe of potential bidders. This communal benefit also has positive implications for future contracts and the market forces underlying the bidding process. The District Court should therefore feel free to exercise its discretion to impose a reasoned and appropriate upward variance if the loss calculation understates the loss resulting from Appellants' crimes. Indeed, as the Ninth Circuit Court of Appeals highlighted in *Martin*, "district courts have the ability to base an upward variance on a broader concept of harm than the Guidelines contemplate."[130] Certainly, "[n]othing in our ruling today is meant to limit district courts' discretion to depart or vary from the Guidelines in appropriate cases, but a sentence must begin with a proper calculation of the Guidelines sentencing range."[131]

### D. Forfeiture

Lastly, we consider Alpha's argument that the District Court erred in ordering forfeiture of the *entire profit amount* on the contracts; more specifically, we consider whether that order was constitutionally excessive.[132]

---

final loss amount is zero). We doubt that this holds true, particularly because the face value of the subcontracts likely factored in Markias' kickbacks, in addition to the actual cost of the paint supplies and the true vendors' profits.

[129] *Nagle*, 803 F.3d at 181.

[130] *Martin*, 796 F.3d at 1111–12.

[131] *Id*. at 1112.

[132] Alpha's assertion that the forfeiture order violates the Eighth Amendment is a question of law subject to plenary

The Court sentenced Alpha to five years of probation, a $4,400 special assessment, and a $500,000 criminal fine. The government also sought criminal forfeiture of Alpha's wire fraud proceeds under 28 U.S.C. § 2461(c) through the civil forfeiture provision, 18 U.S.C. § 981, which does not require any special circumstances as a prerequisite to forfeiture for wire fraud crimes.[133] The District Court imposed forfeiture of $10,906,553, representing one-half of the $21,813,106 gross profits received by Appellants from the Philadelphia Projects.

As a preliminary matter, the Parties dispute the burden of persuasion under the Court's forfeiture order. We now clarify that the government must prove its forfeiture allegations by a preponderance of the evidence. As we explained in *United States v. Voigt*,[134] the reason the government is held to a higher burden in RICO cases is because RICO's forfeiture provisions are unprecedented in their nature and breadth, "sweep[ing] far more broadly than the elements of the substantive RICO offense itself."[135] Therefore, "since the identity and extent of property subject to forfeiture will not have been addressed in the course of proving the substantive RICO charge, a reasonable doubt burden of persuasion ensures greater accuracy in determining the scope of property subject to forfeiture."[136] That reasoning does not apply to prosecutions for mail or wire fraud.

Similar to the money laundering charge in *Voigt*, Alpha's wire fraud conviction entitles the government only to property which represents or is "traceable to" the fraudulent activity.[137] "Unlike the RICO context, we have no reason to doubt that the amount of the transaction that forms the basis of a substantive [wire fraud] offense . . . will have been proved

---

review. *United States v. Various Computs. & Comput. Equip.*, 82 F.3d 582, 589 (3d Cir. 1996).

[133] § 2461(c) integrates § 981 into criminal proceedings. *See United States v. Contorinis*, 692 F.3d 136, 145 n.2 (2d Cir. 2012).

[134] 89 F.3d 1050 (3d Cir. 1996).

[135] *Id*. at 1084.

[136] *Id*.

[137] *Id*. at 1082.

beyond a reasonable doubt at trial."[138] Thus, a preponderance of the evidence burden is appropriate in evaluating forfeiture for wire fraud. The District Court applied the correct test.

Under § 981(a)(1)(C), when a person is convicted of violating § 1343, the District Court is directed to order the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the wire fraud, as well as a conspiracy to commit the wire fraud under § 1349.[139]

To its credit, here, the District Court realized that its forfeiture order may be disproportionate to the gravity of the wire fraud offenses that forfeiture is designed to punish. The Court stated:

> I'm going to sign this forfeiture order, but I do encourage the government to take heed of what I have said here today, which is in essence that it would not behoove society at large or the individuals who work at Alpha to do anything that would result in closure of the company. And I know that there is flexibility in terms of obtaining forfeiture funds, and I encourage the government to exercise that flexibility.[140]

The outer limits of forfeiture orders are circumscribed by the Eighth Amendment's prohibition of excessive fines.[141] A civil penalty violates the Excessive Fines Clause if it is "grossly disproportional to the gravity of the defendant's

---

[138] *Id.* at 1084.

[139] In particular, § 981(a)(1)(C) directs the forfeiture of property traceable to "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7). Under § 1956(c)(7)(A), "specified unlawful activity" encompasses "any act or activity constituting an offense listed in Section 1961(1) of this title." This includes wire fraud under § 1343.

[140] A3848.

[141] *See United States v. Bajakajian*, 524 U.S. 321, 327–28 (1998); *United States v. Cheeseman*, 600 F.3d 270, 282–83 (3d Cir. 2010) (applying *Bajakajian* to civil forfeiture).

offense."[142]

In *United States v. Bajakajian*, a defendant pled guilty to failing to report exported currency.[143] The government sought forfeiture of the entire currency amount that the defendant failed to declare.[144] The Supreme Court held that, under the circumstances there, ordering forfeiture of the entire amount would violate the Excessive Fines Clause.[145] "According to the Court, the 'touchstone of the constitutional inquiry . . . is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish.'"[146] The *Bajakajian* Court considered four factors (the "*Bajakajian* factors") to analyze proportionality: (1) the essence of the crime and its relation to other criminal activity; (2) whether the defendant fits into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct.[147]

Although the District Court here presciently acknowledged the potential impact of its forfeiture order on Alpha's employees, it neither applied the *Bajakajian* factors nor made factual findings regarding them.[148] Although we could theoretically evaluate some of these factors based on this record (such as the maximum sentence and fine that could have been imposed), we think it's better for the factors to be applied by "the district courts in the first instance."[149] Accordingly, we will also vacate the forfeiture order and remand to the District Court for consideration of the *Bajakajian* factors.

---

[142] *Id.* at 337.

[143] *Id.* at 324–25.

[144] *Id.* at 326, 344.

[145] *Id.* at 324.

[146] *Cheeseman*, 600 F.3d at 283 (quoting *Bajakajian*, 524 U.S. at 334).

[147] *See Bajakajian*, 524 U.S. at 337–39.

[148] *See Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424 (2001) (considering the Eighth Amendment's prohibition against excessive fines in the context of a damages award against a company).

[149] *Bajakajian*, 524 U.S. at 336.

## III.    Conclusion

For the foregoing reasons, we will affirm Kousisis and Alpha's convictions under 18 U.S.C. §§ 1343 and 1349. We also will not disturb the District Court's jury instructions. However, we will reverse the District Court's loss calculation and remand for resentencing. We will also vacate the District Court's forfeiture order and remand for additional consideration consistent with this opinion.